J-A19037-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MANUEL AGOSTO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JRA EXPRESS, INC. | : | No. 1001 MDA 2021 |

Appeal from the Order Entered June 29, 2021
In the Court of Common Pleas of Dauphin County Civil Division at No(s):
2017-CV-06261-CV

BEFORE:   BOWES, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:        **FILED: SEPTEMBER 27, 2022**

Plaintiff/Appellant Manuel Agosto appeals from the trial court's order of June 29, 2021, granting summary judgment in favor of Defendant/Appellee JRA Express, Inc. ("JRA") and dismissing Agosto's action raising one count of Wrongful Termination and one count claiming a violation of the Pennsylvania Wage Payment and Collection Law.  We affirm.

On December 14, 2015, JRA hired Agosto as a commercial truck driver. JRA terminated Agosto's employment on July 15, 2016.  In Agosto's legal action filed with the trial court, he maintained JRA wrongfully terminated him because he refused to receive part of his wages in the form of "under the table" cash payments.  He raised an additional claim asserting he was owed

---

[*] Former Justice specially assigned to the Superior Court.

one-half week of earned but unused accrued vacation time. He sought

economic and punitive damages, as well as costs and fees.[1]

_____

[1] The trial court opinion, attached *infra*, sets forth in more detail its findings of fact, which observe that after Agosto had indicated in early 2016 his intention to quit, he accepted JRA's offer to increase his pay by paying him both by paycheck plus a separate cash payment. Agosto received pay under this arrangement from February until the beginning of April 2016, when Agosto emailed JRA indicating he no longer wished to receive cash payments but wanted his entire $1,450 included in a single paycheck. Agosto also indicated his understanding that he would be eligible for a one-week (paid) vacation as of May 2016 and he intended to use it in July.

JRA essentially agreed to Agosto's demands, with the exception of stating he would be paid for only one-half of his week vacation. Agosto replied that he agreed to JRA's counteroffer. He later asserted he refused cash payments because he felt there were no tax withholdings and they were, therefore, illegal.

However, JRA reported to its third-party payroll company that Agosto's receipt of $2,500 in cash wages were taxable earnings, specifically classified as "Extra Comp" in a final paystub issued to Agosto in July 2016. The paystub reflected tax withholdings from this extra compensation.

Also, JRA's "Expense Cash Record", which recorded reimbursements paid to employees for expenses incurred, reflected that JRA reimbursed Agosto $2,450 from February 26 through April 8, 2016. This document bears no signature of Agosto, and Agosto claims it is a fake document prepared for litigation.

Agosto also claimed retaliatory actions by JRA after he asked them to cease cash payments for fear the payments were part of a tax fraud scheme. A hostile work environment emerged wherein his communications were ignored and he was subject to frequent yelling by superiors.

This retaliatory response included the "short-changing" of his paid, one-week vacation that he claims he was promised at the beginning of his employment. JRA denied this claim.

Agosto was eventually terminated and he filed the present suit.

As noted, the trial court granted JRA's motion for summary judgment on both counts. Regarding Count I, the trial court found Agosto was an "at-will" employee and, as such, bore the burden of demonstrating a genuine issue of material fact that a clear mandate of Pennsylvania public policy was implicated in his claim and thus qualified for an exception to the otherwise strong presumption that the at-will nature of employment in the Commonwealth requires protection. Although the trial court intimated that Agosto's assertions regarding JRA's partial cash payments appeared credible, while JRA's assertions to the contrary appeared incredible, it explained that the nature of the controversy alleged in this claim still failed to implicate a clear mandate of Pennsylvania public policy.

Specifically, the trial court catalogued a host of decisions holding that the claimed public policy of this Commonwealth must go to the heart of a citizen's rights, duties, and responsibilities, and may not simply allege a possible federal crime, which in this case would involve violations of federal tax law. ***See***, ***e.g.***, ***McLaughlin v. Gastrointestinal Specialists***, ***Inc.***, 750 A.2d 283, 286-288 (Pa. Super. 2000) (holding an at-will employee will be entitled to bring a cause of action for termination only in the "most limited of circumstances" where the termination implicates a clear mandate of public policy in this Commonwealth, as articulated in the Pennsylvania Constitution, by the Pennsylvania Legislature, or through judicial decisions). ***See also Castro v. Air-Shield, Inc.***, 78 Bucks Co. L. Rep. (Aug. 20, 2004) (employee's alleging employer's violation of FDA regulations failed to implicate

Pennsylvania public policy, which derives from Pennsylvania's constitution, court decisions, and statutes).

To the extent Agosto argued that Pennsylvania Code provisions concerning tax withholding, obstruction of administration of law, aiding consummation of a crime, and unsworn falsification to authorities had been violated by JRA, the trial court similarly found the provisions in question were not of the magnitude or import to reflect a "clear mandate of the public policy of this Commonwealth," particularly where there is no indication that Agosto attempted to protect the purportedly clear public policy mandate by reporting JRA's alleged wrongdoing to any state or federal authority. Under such facts, the trial court settled on the well-settled general rule that an "at-will" employee can be terminated for any reason or no reason at all. **See McLaughlin**, **supra**.

This timely appeal followed. Herein, Agosto raises two issues. In his first issue, he contends that the tax evasion he alleged did, in fact, reflect a clear mandate of Pennsylvania public policy. Like all Pennsylvania employees working for a Pennsylvania employer, he argues, he is mandated to set aside a portion of his compensation to pay Pennsylvania taxes. Yet, JRA was requiring that he receive part of his pay in cash in order to avoid these tax obligations.

Courts have recognized that only a very small number of wrongful termination scenarios will implicate a clear mandate of Pennsylvania public policy. **See Rothrock v. Rothrock Motor Sales, Inc**., 883 A.2d 511, 516

(Pa. 2005) (termination of supervisor for failure to dissuade subordinate from filing Workers Compensation Act claim); ***Shick v. Shirey***, 716 A.2d 1231, 1237 (Pa. 1998) (termination for filing a Workers Compensation Act claim); ***Reuther v. Fowler & Williams, Inc.***, 386 A.2d 119, 121 (Pa. 1978) (termination for missing work due to jury service); ***Novosel v. Nationwide Ins. Co.***, 721 F.2d 894, 900–01 (3d Cir.1983) (termination for refusal to participate in private employer's lobbying effort after employee stated his opposition to employer's political stand); ***McGuckin v. Brandywine Realty Tr.***, 185 F. Supp. 3d 600, 608 (E.D. Pa. 2016) (collecting cases).

Agosto cites to several Pennsylvania federal district court decisions holding that employees had adequately pleaded that they were wrongfully terminated in violation of Pennsylvania public policy. ***See Urban v. Walgreen, Co.***, 2014 WL 7232240 (E.D. Pa. Dec. 18, 2014) (holding employee sufficiently pleaded claim for wrongful termination on allegations termination occurred for his refusal to aid in the commission of fraud or theft-by-deception of insurance companies through fraudulent billing schemes); ***Godwin v. Visiting Nurse Ass'n Home Health Servs.***, 831 F. Supp. 449 (E.D. Pa. 1993), *aff'd* 39 F.3d 1173 (3d Cir. 1994) (holding in wrongful termination case that Pennsylvania public policy was implicated by claim employer terminated its bookkeeper-accountant after she refused to prepare documents in support of employer invoices seeking reimbursement from Medicare program for costs that were not reimbursable).

JRA responds that Agosto relies on unreported federal decisions involving motions to dismiss, none of which applies to the facts and issue at bar. JRA, instead, relies on **Booth v. McDonnell Douglas Truck Services, Inc.**, 585 A.2d 24 (Pa. Super. 1991). In **Booth**, plaintiff asserted a claim for wrongful discharge after he was fired for asserting a claim under the WPCL. **Id**. at 243, 585 A.2d 24. The Superior Court concluded that an employer may fire an employee for insisting on pay as promised. **Id.** ("[T]he compensation due an employee is clearly an area where the employer has a legitimate interest, and we find no violation of public policy here."). In support of this conclusion, the court explained that plaintiff could recover under a breach of contract theory for any compensation due and owing. **Id**. at 24.

In Appellant's second issue, he challenges the trial court's determination that the Wage Payment and Collections Law (WPCL) does not create a substantive right to compensation for *unused* vacation time in this case because vacation time is precluded by JRA's employment policy, which clearly and unambiguously states that unused vacation time is not compensable upon termination. The WPCL only establishes an employee's right to enforce payment of wages and compensation to which the employee is otherwise entitled by the terms of an agreement. Here, there exists no contract between JRA and Agosto that entitles Agosto to the vacation time he now seeks.

Had Agosto presented such a claim for *used* vacation time, the trial court explains, summary judgment against him would not have been entered, because Agosto had asserted there existed an oral agreement between JRA

- 6 -

and himself which pre-dated issuance of the Employee Handbook. There is no such oral agreement regarding unused vacation time however, so summary judgment in favor of JRA on this issue was granted.

After a thorough review of the record, the parties' briefs, the applicable law, and the well-reasoned opinion of the Honorable John J. McNally, III, we conclude that Appellants' issues merit no relief. As summarized above, the trial court opinion comprehensively discusses and properly disposes of Appellants' appellate issues. *See* Trial Court Opinion, 10/13/21, at 1-11. Accordingly, we adopt the trial court's opinion as our own and affirm on that basis.

We conclude, therefore, that the trial court did not abuse its discretion or commit legal error in granting summary judgment in favor of JRA and dismissing Agosto's claims. The parties are instructed to attach the opinion of the trial court in any filings referencing this Court's decision.

Order affirmed.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/27/2022

**Copies Distributed**

Date 10\13\21  ·  ⟶J–m̲

| | |
|---|---|
| MANUEL AGOSTO, | : IN THE COURT OF COMMON PLEAS |
|         Plaintiff | : DAUPHIN COUNTY, PENNSYLVANIA |
| | : |
| | : |
|       v. | : NO. 2017 CV 6261 CV |
| | : |
| JRA EXPRESS, INC., | : |
|         Defendant | : CIVIL ACTION – LAW |

**October 13, 2021**

## MEMORANDUM OPINION

Plaintiff Manuel Agosto appeals from this Court's Order of June 29, 2021, granting summary judgment in favor of Defendant JRA Express, Inc. (JRA). This opinion is offered in support of the Court's Order, pursuant to Pa.R.A.P. 1925(a).

## Procedural Background

Plaintiff initiated the current action in 2017 and later filed an Amended Complaint against JRA asserting claims for wrongful termination (Count I) and violation of the Pennsylvania Wage Payment and Collection Law (Count II). Plaintiff had been hired as a commercial truck driver by JRA on December 14, 2015 and was terminated July 15, 2016. Plaintiff asserted in Count I that he had been terminated primarily for refusing to engage in illegal activity with JRA by receiving part of his wages in cash. In Count II, Plaintiff asserted that he was wrongfully denied payment for one-half week of earned but unused vacation time accrued during his employment. He sought damages for economic losses and unpaid vacation time, punitive damages, and costs and fees.

After the pleadings were closed, JRA filed a summary judgment motion seeking dismissal of Plaintiff's claims. Following oral argument, this Court granted the motion, entering the following Order:

> **AND NOW,** this 29th day of June 2021, with the benefit of Oral Argument, Defendant's Motion for Summary Judgment on Count I (Wrongful Termination) is **GRANTED.** The Court finds that Plaintiff's employment was "at-will," and Plaintiff has not demonstrated a genuine issue of material fact to articulate a clear mandate of public policy to be protected.

1

Defendant's Motion for Summary Judgment to Count II (Wage Payment and Collections Law) is, likewise, **GRANTED.** The Wage Payment and Collections Law cannot create a substantive right to compensation for unused vacation time which is clearly and unambiguously precluded by the policy regarding same.

Plaintiff has appealed from this Order, which appeal is currently pending.

## Factual Background

JRA is a commercial trucking company based in Middletown, Pa. It was newly created in 2015 and Plaintiff was its first employee, hired on December 14, 2015. As noted, he was employed for less than one year until his termination on July 15, 2016.

A few months into his employment, in February 2016, Plaintiff advised JRA's co-owner Richard Alleyne, that he intended to quit. Plaintiff asserts that in an effort to retain him, JRA offered to increase his pay from $1,100 to $1,450 per week. Plaintiff initially rejected JRA's proposal but the parties later came to an agreement whereby Plaintiff would be paid $1,100 via paycheck plus a cash payment for additional deliveries made each week. The agreement between JRA and Plaintiff concerning cash compensation remained in effect from late February 2016 until April 7, 2016. It is undisputed that Plaintiff received wages of $2,450 from JRA in the form of cash and gift card payments during this time period.

On April 7, 2016, Plaintiff sent an email to JRA stating he no longer wished to receive cash payments but wanted his entire pay of $1,450 included in a single paycheck instead of by cash and check. (Defendant's Exbt. D) In the same email, Plaintiff listed his understanding of his daily delivery and load pickup schedule. (Id.) Plaintiff additionally noted in the email that he had a conversation with Alleyne on April 1, 2016 confirming that he would be eligible for a one-week (paid) vacation as of May and that he intended to use it in July. (Id.)

In response, JRA agreed with Plaintiff's understanding of his schedule with some stipulations, clarified his weekend load schedule and agreed to stop paying partial wages in cash. (Id.) JRA also agreed to the vacation date he requested, but stated that he would be paid for only one-half of his one-week vacation. JRA noted that it would send Plaintiff the Employee Handbook the next day and excerpted the vacation policy language thereto. The

2

excerpt set forth the vacation accrual policy and also that no accrued vacation time would be paid upon an employee's termination. (Id.)

Plaintiff emailed back stating "I am in agreement." (Id.) He additionally requested that he start receiving pay stubs on a weekly basis and sought clarification as to his total loads and mileage. (Id.) JRA responded by email, agreeing to provide Plaintiff with weekly electronic paystubs and clarified his weekend obligations. (Id.)

Plaintiff later asserted that he asked for cash payments to cease because there were no tax withholdings and he believed he would be engaging in illegal activity with JRA to continue to receive cash.

At some point in time, not clear from the record, JRA reported to its third party payroll company that Plaintiff received $2,450 as taxable earnings, which is the amount the parties agree Plaintiff was paid in cash. These earnings were classified as "Extra Comp" in a final paystub issued to Plaintiff, on or around July 28, 2016, by the payroll company. (Defendant's Exbt. F) The paystub presumably reflects tax withholdings from this extra compensation.

The record also includes an undated document created by JRA titled "JRA Expense CASH RECORD," which appears to be a template form used by JRA presumably for use by its employees to request reimbursement from JRA for expenses incurred. (Defendant's Exbt. E) The expense form in the record reflects that JRA recorded that Plaintiff ("employee") had seven expense entries of reimbursable expenses for "Meal, Travel, Gas" totaling $2,450 for the period from February 26 through April 8, 2016. The expense form is undated and not signed by Plaintiff. JRA has not provided any source documents supporting the nature of any expenses it recorded as being reimbursable expenses incurred by Plaintiff. Plaintiff asserts that the expense form is a "fake document created for litigation" and that Plaintiff was never reimbursed for "expenses" in the amount of $2,450. (Plaintiff's Response to SJM, ¶ 10)

Plaintiff asserts that after he asked for JRA to cease cash payments in his April 7, 2016 email, JRA began to retaliate against him, which he claims was because he refused to further engage in tax fraud. Plaintiff claims that JRA made numerous changes to his schedule and that

3

he received little to no communications or responses to his own communications. He claims he was frequently yelled at and his work place became a hostile environment.

Plaintiff also claimed that as part of the retaliation, JRA short changed his paid vacation time. Plaintiff alleges that at the beginning of his employment, JRA verbally promised him that he would be entitled to one-week of paid vacation and that he never received an Employee Handbook reciting any vacation policy until after JRA had agreed to pay him a full week. JRA's Alleyne testified that he believed the vacation policy was initially a verbal policy and that it was put into written form in the Employee Handbook sometime between late Winter 2015 and Spring 2016. (Plaintiff's Exbt. L (p. 42)) In any event, Plaintiff objected to the policy and JRA was firm that it had clearly communicated the vacation policy to him. (See Plaintiff's Exbt. S (emails))

At some point during his employment, Plaintiff began to communicate with Thomas Callahan, a Compliance Specialist for FedEx. FedEx was one of JRA's main clients and it required that JRA enter into a standard contractor operating agreement with it. As part of the operating agreement, JRA promised to comply with certain legal provisions including that all of JRA's personnel "be treated as employees for all payroll, tax, withholding, insurance, and other purposes under applicable law." JRA also promised to provide certain employment and payroll records to FedEx as requested. (Plaintiff's Exbt. V)

In a July 1, 2016 email, Plaintiff reached out to Callahan and complained that JRA was retaliating by withholding promised vacation time and refusing to give him a promised pay raise, and that he was afraid to meet with his JRA bosses because they intimidated him. (Plaintiff Exbt. N) He asked that Callahan keep his contact confidential. A few days before he was terminated, Plaintiff exchanged more emails with Callahan. On July 12, 2016, Plaintiff received an email from Callahan asking for more information about Plaintiff's report that JRA paid him in cash. (Plaintiff Exbt. B, E, F) Callahan asked for specifics and any evidence as to how much JRA paid him in cash, when it occurred and if he knew if other employees were paid in cash. (Id.) Plaintiff responded he would rather discuss matters in a call. A few days later, Plaintiff shared with Callahan screenshots of texts from JRA confirming its agreement to pay him partially in cash and also on one occasion by gift card. (Plaintiff's Exbts. C, G, Y) On

4

July 15, 2016, Plaintiff informed Callahan in an email that he was so anxious from talking to Callahan that he called in sick and that JRA did not initially respond to him but later called and yelled at him and changed his delivery run. (Plaintiff's Exbt. K)

Also on July 15, 2016, Plaintiff sent an email to JRA stating that he thought it was unfair that JRA was short changing him with his schedule and runs and that he noticed that his unfair treatment began after he sent JRA his April 7, 2016 email (concerning his daily schedule and that he no longer wanted cash payments). (Defendant's Exbt. I) He complained to JRA that it was "unprofessional." (Id.) Within fifteen minutes of sending this email, JRA responded that it was officially terminating his employment effective immediately. In the same email, JRA wrote: "JRA EXPRESS NEVER PAID YOUR WORK SALARY IN CASH. You received a check every week. You have pay stubs receiving checks. We have documentation to prove this. Any correspondence from here on out will be from our lawyer." (Plaintiff's Exbt. O (Caps in original))

JRA's co-owner Alleyne stated that Plaintiff was fired for a number of reasons including unprofessional behavior to staff and customers, insubordination, shift abandonment, refusing to do pickups, attendance, and poor performance. (See Defendant's Exbt H (Alleyne dep. at 10-12)) He recalled on one occasion that Plaintiff refused to do a pickup from a new customer, Chewy, and also that another customer, Nordstrom, formally complained to JRA in an email dated April 13, 2016 that Plaintiff did "not listen to instructions and has a poor attitude." (Id. (dep. at 12); Defendant's Exbt. G) Alleyne stated that JRA often verbally reprimanded Plaintiff for his conduct though he was never given any written warnings nor disciplined. (Exbt H (dep. at 13, 39-40) Alleyne admitted that after Plaintiff was terminated, JRA did not oppose him receiving unemployment compensation. (Id. (dep. at 38))

On October 12, 2016, a few months after Plaintiff was terminated, Alleyne sent a letter to FedEx in which JRA offered assurances to FedEx that it would comply with the FedEx-JRA operating agreement, including that it would treat all JRA personnel as employees and "will ensure that similar breaches will never occur in the future." (Plaintiff's Exbt. W) JRA also promised to FedEx that it would do the following with regard to employee compensation:

properly pay quarterly uninsurance, properly pay state and federal tax, maintain proper payroll records, and ensure correct federal and state deductions.[1] (Id.)

Following his termination, Plaintiff was unemployed for approximately one month. Thereafter, he became employed for a number of months as a truck driver earning wages slightly below what he earned with JRA. In February 2017, Plaintiff took another job earning approximately $1,500 per week, until approximately August 2017, when his pay was reduced to approximately $700 per week. As sometime thereafter, Plaintiff became unemployed and remained unemployed through the date of his deposition (in November 2020). Plaintiff asserts that following his termination, JRA refused to pay him for one-half of earned vacation time, approximately $725.

## Legal Discussion

Pennsylvania Rule of Civil Procedure 1035.2 allows a court to enter judgment in favor of a moving party "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report." Pa. R.C.P. 1035.2. In other words, "where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered." Shepard v. Temple Univ., 948 A.2d 852, 856 (Pa. Super. 2008). The party opposing a motion for summary judgment "must do more than allege unsupported allegations" as they cannot create genuine issues of material fact. Golaschevsky v. Dept. of Envtl. Res., 683 A.2d 1299, 1302 (Pa. Commw. 1996). If the party opposing the motion fails to meet its burden of showing the existence of a material issue of fact, the moving party is entitled to judgment as a matter of law because a jury cannot be allowed to reach a verdict "merely on the basis of speculation or conjecture." See, Young v. Com., Dept. of Transp., 744 A.2d 1276, 1277 (Pa. 2000).

In addressing a summary judgment motion, this Court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter

---

[1] It is not clear from the record whether JRA was aware, when it terminated Plaintiff, that Plaintiff had reported his cash payments to FedEx's compliance officer Callahan in the week prior to his termination and/or whether JRA's letter to FedEx was related to issues Plaintiff had raised with Callahan, including cash payments.

of law will summary judgment be entered. Doman v. Atlas America, Inc., 150 A.3d 103, 105 (Pa. Super. 2016) (citation omitted).

At the outset, this Court notes that it rejected JRA's claim that it was entitled to summary judgment on the wrongful termination claim because no factfinder could believe, according to JRA, that Plaintiff was fired for reporting allegedly illegal payments given (a) the amount of time that elapsed from the date of the April 2016 request until Plaintiff's termination on July 15, 2016, (b) JRA's immediate compliance with Plaintiff's request that it cease making cash payments to him, and (c) Plaintiff's "well-documented poor work performance." This Court additionally rejected JRA's argument that that there was no factual dispute that that the record showed that all amounts paid to Plaintiff were reported and required deductions made through JRA Express's payroll company, revealing JRA was not in violation of any laws or regulations.

The record before the Court raises a number of substantial questions concerning JRA's credibility that a factfinder would have to consider in deciding the reason or reasons JRA fired Plaintiff. Most notably, while it does appear that JRA did at some point report to its payroll company that JRA paid Plaintiff $2,450 as "Extra Comp" and that proper tax withdrawals were made therefrom - as reflected on its July 28, 2016 payroll summary (see Defendant's Exbt. F) - it is unclear from the record when JRA properly reported this (cash) compensation. The record suggests JRA initially tried to hide or deny the existence of the cash payments for a period of time.[2] For instance, in its termination email sent to Plaintiff on July 15, 2016, JRA voluntarily announced to Plaintiff that it had **never** paid his work salary in cash (Plaintiff's Exbt. O), which was untrue and which JRA does not currently dispute. Furthermore, JRA created an expense document at some unknown point in time which shows that JRA may have intended to treat the $2,450 cash wages paid to Plaintiff as reimbursable expenses incurred by Plaintiff. (Defendant's Exbt. E) Plaintiff, in fact, has asserted that this the expense document is "fake," which presumably categorized $2,450 cash payments as non-taxable expenses and not taxable income. Furthermore, Plaintiff has alleged that JRA's retaliation against him began right after he asked that cash

---

[2] Neither party has provided any record of contemporaneous documentation prior to July 28 2016, reflecting when JRA reported Plaintiff's cash payments to the payroll company, and whether this occurred before or after Plaintiff asked that cash payments cease and/or whether the extra the compensation was reported prior to Plaintiff's termination.

7

payments cease, which allegation was documented in an email Plaintiff sent to Callahan prior to his termination.

This Court also rejected JRA's assertion that the undisputed and "well-documented" record reflects that Plaintiff was terminated on July 15, 2016 as a result of unprofessional behavior to staff and customers, insubordination, shift abandonment, attendance, and poor performance. The evidence in support of JRA's position that Plaintiff was fired for cause is not as well-documented as JRA suggests. Besides the single written complaint on April 13, 2016, from Nordstrom to JRA complaining about Plaintiff's deliveries, JRA presented no other documentary evidence supporting its claims that JRA repeatedly verbally warned and reprimanded Plaintiff about his poor performance, insubordination etc. Plaintiff has denied that he was continually reprimanded.

This Court, viewing the record most favorably to Plaintiff, finds that Plaintiff has presented sufficient evidence he might have been retaliated against and ultimately fired by JRA for declining to receive income from JRA in cash and gift cards for which no tax withholdings were made (either for the employer or employee); i.e. for refusing to participate in illegal activity. These are clearly facts in dispute and a factfinder may or may not believe JRA's stated reasons for firing Plaintiff.

Having so found, this Court believes that it was nevertheless constrained under the law to hold that Plaintiff does not have a remedy on his wrongful termination claim. As a general rule, an at-will employee has no claim against an employer for termination of employment or "wrongful termination." Clay v. Advanced Computer Applications, Inc., 559 A.2d 917, 918 (Pa. 1989); Geary v. United States Steel Corp., 319 A.2d 174 (Pa. 1974). "Exceptions to this rule have been recognized in only the most limited of circumstances, where discharges of at-will employees would threaten clear mandates of public policy." Clay at 918. As our Supreme Court explained:

> This Commonwealth has reiterated since the turn of the last century that an employer may terminate an employee for any reason, unless restrained by contract. *E.g., Henry v. Pittsburgh & Lake Erie Railroad Co.*, 139 Pa. 289, 21 A. 157 (1891). This remained the untouched law of the employment relation until our decision in *Geary v. United States Steel Corporation*, 456 Pa. 171, 319 A.2d 174 (1974) stated that an employee may bring a non-statutory cause of action against an employer for that employee's termination, under very limited exception. Although we ultimately found that *Geary* did not set forth a cause of action, in *dicta* we left open the

8

possibility of a wrongful discharge claim in circumstances where a termination of an employee would violate a "clear mandate of public policy." 319 A.2d at 180.

...

From these cases, we glean that, as a general proposition, the presumption of all non-contractual employment relations is that it is at-will and that this presumption is an extremely strong one. **An employee will be entitled to bring a cause of action for a termination of that relationship only in the most limited of circumstances where the termination implicates a clear mandate of public policy in this Commonwealth.**

McLaughlin v. Gastrointestinal Specialists, Inc., 750 A.2d 283, 286-287 (Pa. 2000) (emphasis added, footnote omitted). The Pennsylvania Supreme Court has "steadfastly resisted any attempt to weaken the presumption of at-will employment in this Commonwealth." Id. at 290.

"The public policy claimed to have been violated must go to the heart of a citizen's rights, duties and responsibilities or the discharge is not wrongful." Booth v. McDonnell Douglas Truck Services, Inc., 585 A.2d 24, 28 (Pa. Super. 1991). Furthermore, the public policy at issue must be articulated in the Pennsylvania Constitution, by the Pennsylvania legislature or through judicial decisions. McLaughlin at 288. "A plaintiff must do more than show a possible violation of a federal statute ... [and] must allege that some public policy of this Commonwealth is implicated, undermined, or violated." Id.; See also Kelly v. The Retirement Pension Plan For Certain Home Office, 2003 U.S. App. LEXIS 18481 (3rd. Cir. 2003) (citing McLaughlin; no violation of public policy when employee terminated after objecting to marketing methods arguably in violation of federal Securities and Exchange Act of 1984); Castro v. Air-Shield, Inc., 78 Bucks Co. L. Rep. 94, 101 (Aug. 20, 2004) (court found no violation of Pennsylvania public policy when former employee cited FDA regulations, stating instead, Pennsylvania public policy is determined by examining Pennsylvania's Constitution, court decisions and statutes).

This Court agreed with JRA's argument that Plaintiff has failed to identify any clear mandate of Pennsylvania public policy that was violated. Plaintiff references a number of provisions from the Pennsylvania Code concerning the withholding of taxes, "obstructing administration of law," "aiding consummation of a crime," and "unsworn falsification to authorities." However, there is no judicial or legislative authority for Plaintiff's proposition that these Code provisions reflect a "clear mandate of the public policy of this Commonwealth" that warrants an exception to the strong "at-will" nature of employment in the Commonwealth. The

9

record is further devoid of any evidence that Plaintiff sought to protect the purported clear mandate of Pennsylvania public policy by reporting any alleged wrongdoing to any state or federal authority. In short, as an "at-will" employee, Plaintiff could be terminated for any reason. Thus, this Court granted summary judgment in favor of JRA as to the wrongful termination claim in Count I.

In Count II, Plaintiff asserted a violation by JRA of the Pennsylvania Wage Payment and Collection Law (WPCL)[3] for JRA'S failure to pay him for one-half of a week of unused vacation time accrued during his employment, totaling approximately $725. (Am. Complaint, ¶ 21) Because JRA's employment policy clearly and unambiguously states that unused vacation time is not compensable upon termination, this Court dismissed Plaintiff's claim.

The WPCL "does not create an employee's substantive right to compensation; rather, it only establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement." Hartman v. Baker, 766 A.2d 347, 352 (Pa. Super. 2000) (citation omitted). JRA's policy, set forth in its Employee Handbook, addresses unused vacation and explicitly provides:

> All vacation time must have your supervisor's approval and must be scheduled two weeks prior to requested time off, except in cases of emergency. **There is no carryover or payment for unused vacation time nor is there any payment of accrued vacation upon termination (either voluntary or involuntary).** As a reminder, please note accrued and/or earned sick or personal days are not paid upon termination.

Defendant's Exbt. J (emphasis added).

In the absence of a contractual agreement between Plaintiff and JRA that allows for payment of unused vacation upon termination of employment, Plaintiff cannot maintain a WPCL claim. There is no evidence of any agreement between JRA and Plaintiff that contradicts JRA's Employee Handbook policy. Thus, JRA was entitled to judgment as a matter of law with respect to Count II.

This Court notes that the claim Plaintiff raised in his Amended Complaint, for payment of accrued but *unused* time, is a different claim than one Plaintiff suggests in other parts of the

---

[3] 43 P.S. § 260- et seq.

10

record, which is that when he was hired, JRA promised him one-week of paid vacation time but that JRA later reneged on that and offered him only one-week of vacation at half-pay. This Court agrees with Plaintiff that if the issue presented was whether Plaintiff should have been paid for a full week or a half-week for *used* vacation time, this Court would not have granted summary judgment in JRA's favor inasmuch as Plaintiff asserted he had an oral agreement with JRA on that particular issue, which pre-dated issuance of the Employee Handbook. However, this is not the claim Plaintiff has presented. His claim is for payment of *unused* vacation time following termination and there was no evidence presented by Plaintiff that he had any oral agreement with JRA concerning this particular employment benefit. As such, JRA's vacation policy applies, which clearly and unambiguously precluded Plaintiff from compensation for unused vacation time.

Accordingly, this Court entered its Order of June 29, 2021, granting summary judgment in favor of the Defendant JRA and dismissing Plaintiff's claims.

_____October 13, 2021_____
Date

_____John J. McNally, III, Judge_____

Distribution:

James A. Bell, IV, Esq., 1617 JFK Blvd., Ste. 1254, Philadelphia, PA 19103 (for Plaintiff)
jamesbell@bellandbelllaw.com

Michael E. Rowan, Esq., PO Box 88, Harrisburg, PA 17108 (for Defendant)
mrowan@shumakerwilliams.com

11